**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**Fort Wayne Division**

| | |
|---|---|
| **MARCUS SANDERS** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. _____** |
| ) | |
| **PURDUE FEDERAL CREDIT UNION,** ) | |
| Serve: Any Officer ) | |
| 1551 Win Hentschel Blvd. ) | |
| West Lafayette, IN 47906 ) | |
| ) | |
| **and** ) | |
| ) | |
| **WORLD ACCEPTANCE CORPORATION** ) | |
| **d/b/a World Finance,** ) | |
| Serve: C T CORPORATION SYSTEM, Reg. Agent ) | |
| 2 Office Park Court Suite 103 ) | |
| Columbia, SC 29223 ) | |
| ) | |
| ) | |
| **Defendants.** ) | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW the Plaintiff, Marcus Sanders, by counsel, and for his Complaint against Defendants Purdue Federal Credit Union ("Purdue FCU") and World Acceptance Corporation d/b/a World Finance ("World Finance"), he states as follows:

### PRELIMINARY STATEMENT

1. This is an action for statutory, actual, and punitive damages, costs, and attorney fees brought to enforce Plaintiff's civil rights pursuant to the Fair Credit Reporting Act, 15 U.S.C. §§ 1681–1681x ("FCRA").

2. The Fair Credit Reporting Act provides federally codified protection of Plaintiff's civil rights with regard to Plaintiff's privacy, Plaintiff's reputation, and Plaintiff's due process

rights against defamation. The Fair Credit Reporting Act is part of a larger category of consumer protection statutes designed to arm consumers against discrimination, intrusions upon privacy, and other types of unfair and inequitable treatment. Similar statutes falling under this same umbrella of protection include, for example, the Equal Credit Opportunity Act, the Fair Housing Act, and the Fair Debt Collection Practices Act.

3.      Claims under these federal protections are brought "in connection with any action involving a claim of 'unlawful discrimination'", as described in 26 U.S.C § 62(a)(20). For the purposes of 26 U.S.C § 62(a)(20), the term "unlawful discrimination" is broadly defined in 26 U.S.C § 62(e) to mean "an act that is unlawful under . . .[a]ny provision of Federal, State, or local law, or common law claims permitted under Federal, State, or local law . . . providing for the enforcement of civil rights".

4.      Plaintiff is the victim of what is now a common crime—identity theft. A fraudster used Plaintiff's personal information to open accounts with Defendants Purdue FCU and World Finance (the "Fraudulent Accounts").

5.      Plaintiff has asserted the factual truth—that the Fraudulent Accounts do not belong to him and he did not authorize them. Yet despite this truth, Defendants continue to wrongfully attach Plaintiff, and Plaintiff's good name, to accounts that were opened by a criminal.

6.      Defendants also reported the inaccurate accounts to the Big Three consumer reporting agencies ("CRAs"). Plaintiff's disputes of the inaccurate information to the CRAs proved futile. When responding to the CRAs regarding Plaintiff's disputes, Defendants "verified" its false credit reporting—even after receiving detailed information regarding the identity theft.

7.      The FCRA demands that CRAs utilize reasonable procedures to assure the maximum possible accuracy of the information they report. 15 U.S.C. § 1681e(b). When a

consumer disputes an item of information, the agency must investigate the dispute and, if the information cannot be verified, delete it. 15 U.S.C. § 1681i.

8.    Also, when a consumer like Plaintiff disputes the accuracy of information with the CRAs, the CRAs must transmit that dispute to the entity who furnished the information. Here, those entities are Purdue FCU and World Finance (the "Furnishers" or "Defendants"). Each time a Furnisher received one of Plaintiff's disputes from a CRA, that Furnisher became obligated to conduct its own, independent investigation of that dispute. *Id.* § 1681s-2(b).

9.    Plaintiff brings claims under Section 1681s-2(b) against Purdue FCU because it received Plaintiff's disputes from the CRAs and thereafter failed to reasonably investigate those disputes. Instead, discovery will show that all Purdue FCU did was consult its own records about the account and confirm to the CRAs the inaccurate information that it was already reporting.

10.    Similarly, Plaintiff brings claims under Section 1681s-2(b) against World Finance because it received Plaintiff's disputes from Equifax and thereafter failed to reasonably investigate those disputes. Instead, discovery will show that all World Finance did was consult its own records about the account and confirm to Equifax the inaccurate information that it was already reporting.

11.    Additionally, Plaintiff brings claims under Section 1681b against Purdue FCU because it accessed Plaintiff's private information without having a permissible purpose to do so, even after learning that the Purdue FCU account was opened by an identity thief.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p.

13.    Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District and Division.

**PARTIES**

14.     Plaintiff is a natural person residing in the State of Indiana and is a "consumer" as defined by 15 U.S.C. § 1681a(c).

15.     Defendant Purdue Federal Credit Union ("Purdue FCU") is a federally chartered credit union headquartered in West Lafayette, IN.

16.     Purdue FCU is a "furnisher" of information as governed by 15 U.S.C. § 1681s-2.

17.     Defendant World Acceptance Corporation d/b/a World Finance ("World Finance") is a foreign corporation headquartered in Greenville, SC. World Finance has 1,018 branches throughout the United States, with 27 branches in Indiana (including a branch in Lafayette, IN).

18.     World Finance is a "furnisher" of information as governed by 15 U.S.C. § 1681s-2.

**FACTUAL ALLEGATIONS**

***Plaintiff Discovers the Fraudulent Accounts on his Credit Reports
and Disputes those Inaccuracies***

19.     Plaintiff is the victim of identity theft.

20.     An identity thief opened a variety of consumer accounts, rented a car, and even received an Internal Revenue Service Form 1099 in Plaintiff's name using Plaintiff's personal identifiers.

21.     In or around June or July of 2021, Plaintiff discovered that an individual fraudulently acquired a rental car in Georgia using Plaintiff's personal information. This imposter was involved in a car accident while driving the rental and continued to impersonate Plaintiff when interacting with the investigating officer, which resulted in formal charges being filed against Plaintiff.

22.    In August 2021, Plaintiff filed a police report with the Lafayette Indiana Police Department and placed a freeze on his credit with the hope of preventing further fraudulent activities.

23.    In late 2023, Plaintiff discovered extensive false information in his credit reports, including accounts he never opened, inaccurate addresses where he never resided, employers he never worked for, and phone numbers he never used.

24.    The fraudulent and derogatory accounts that Plaintiff discovered in late 2023 included accounts with Defendants Purdue FCU and World Finance. Specifically, Plaintiff discovered a negative deposit account with Purdue FCU and a charged off installment account with World Finance reporting on his credit. Plaintiff did not open these accounts, he did not authorize anyone to open these accounts on his behalf, and he did not benefit from these accounts.

**Plaintiff Disputes with Experian**

25.    On or around January 17, 2024, Plaintiff sent a letter to Experian to dispute the inaccurate and derogatory accounts that Purdue FCU and World Finance were wrongfully reporting as belonging to him. Plaintiff sent the dispute letter via USPS Certified Mail, Return Receipt Requested.

26.    Based on available information and belief, Plaintiff did not receive any response from Experian regarding his dispute dated January 17, 2024.

27.    On or around March 4, 2024, Plaintiff obtained a copy of his Experian credit report and saw that Experian was still reporting the fraudulent and derogatory account with Purdue FCU.

28.    On or around April 25, 2024, Plaintiff again disputed the fraudulent and derogatory information reported by Purdue FCU by sending Experian a letter, via USPS Certified Mail, Return Receipt Requested.

29.     On May 2, 2024, Experian forwarded a copy of Plaintiff's dispute to Purdue FCU.

30.     On May 9, 2024, Purdue FCU agent Brenda Biery responded to the dispute and told Experian that the information being reported by Purdue FCU was accurate.

31.     On or around August 28, 2024, Plaintiff obtained a copy of his Experian credit report and saw that Purdue FCU and Experian were still reporting the fraudulent account on Plaintiff's credit.

32.     On or around September 10, 2024, Plaintiff sent a third dispute letter to Experian via USPS Certified Mail, Return Receipt Requested. In his letter, Plaintiff again disputed the fraudulent and derogatory account with Purdue FCU.

33.     On September 20, 2024, Experian sent a copy of Plaintiff's September 2024 dispute to Purdue FCU.

34.     On September 26, 2024, Purdue FCU agent Brenda Biery responded to Plaintiff's September 2024 dispute, telling Experian that the disputed information was accurate.

35.     On or around October 10, 2024, Plaintiff received dispute results from Experian. The dispute results from Experian showed that the fraudulent Purdue FCU account had been wrongfully verified as accurate.

36.     Based on available information and belief, Purdue FCU and Experian continued to wrongfully report the fraudulent and derogatory Purdue FCU account as belonging to Plaintiff.

**Plaintiff Disputes with Trans Union**

37.     On or around January 17, 2024, Plaintiff sent a letter to Trans Union to dispute the fraudulent and derogatory accounts that Purdue FCU and World Finance were wrongfully reporting to Trans Union as belonging to him. Plaintiff sent the dispute letter via USPS Certified Mail, Return Receipt Requested.

38.     On or around February 13, 2024, Trans Union forwarded a copy of Plaintiff's dispute to Purdue FCU. When Trans Union sent the dispute, it even noted the following: "Consumer comment: Provided FTC identity theft report for case <168196785>."

39.     On February 14, 2024, Purdue FCU agent Brenda Biery responded to the dispute and told Trans Union that the information being reported by Purdue FCU was accurate.

40.     On or about March 7, 2024, Plaintiff received dispute results from Trans Union. Trans Union notified Plaintiff that it had verified Purdue FCU account as accurate. The dispute results did not address the inaccurate and derogatory account with World Finance.

41.     On or about April 25, 2024, Plaintiff again sent a letter to Trans Union to dispute the inaccurate and derogatory account that Purdue FCU and World Finance were wrongfully attributing to Plaintiff. Plaintiff sent the dispute via Certified Mail, Return Receipt Requested, and included a copy of his state issued identification card and social security card. Plaintiff had the letter notarized to verify his identity.

42.     Subsequently, Plaintiff received two different letters via mail, both dated May 1, 2024, from Trans Union. In one letter, Trans Union again stated Plaintiff's proof of address was unreasonable, while in the other letter, Trans Union stated, "after reviewing your dispute request, we found the information you disputed does not currently appear on your TransUnion credit report."

43.     On or around September 5, 2024, Plaintiff obtained a copy of his Trans Union credit report. The report showed that Purdue FCU continued to report the inaccurate and derogatory account to Trans Union. Additionally, a collection agency named Security Credit Services had begun reporting an account to Trans Union in an attempt to collect the fraudulent World Finance debt from Plaintiff.

44.    On or around September 10, 2024, Plaintiff sent a third letter to Trans Union to dispute the accounts that Purdue FCU, Security Credit Services (collecting for World Finance) and Trans Union were wrongfully attributing to Plaintiff. Plaintiff notarized the dispute letter and included a copy of his state issued identification card and Social Security Card. Plaintiff sent the dispute letter via USPS Certified Mail, Return Receipt Requested.

45.    On or around September 17, 2024, Trans Union once again mailed a letter, requesting additional documentation to verify Plaintiff's identity, in response to Plaintiff's notarized dispute.

46.    On September 19, 2024, Trans Union forwarded Plaintiff's September 2024 dispute to Purdue FCU.

47.    On September 19, 2024, Purdue FCU agent Lakin Kaser responded to Plaintiff's September 2024 dispute, telling Trans Union that the disputed information was accurate.

48.    On or around October 13, 2024, Plaintiff received dispute results from Trans Union. Trans Union wrongfully verified as accurate the fraudulent Purdue FCU account. Trans Union's dispute results did not address Plaintiff's dispute of the fraudulent Security Credit Services account. However, a copy of Plaintiff's Trans Union report from November of 2024 showed that the Security Credit Services account was no longer reporting.

49.    Based upon available information and belief, Purdue FCU and Trans Union continued to report the inaccurate and derogatory Purdue FCU account on Plaintiff's credit file.

**Plaintiff Disputes with Equifax**

50.    On or around January 17, 2024, Plaintiff sent a letter to Equifax to dispute the inaccurate and derogatory accounts that Purdue FCU and World Finance were wrongfully

reporting as belonging to him. Plaintiff sent the dispute letter via USPS Certified Mail, Return Receipt Requested.

51.    On or around January 24, 2024, Equifax forwarded Plaintiff's January 2024 dispute to Purdue FCU.

52.    On or around January 24, 2024, Equifax forwarded Plaintiff's January 2024 dispute to World Finance.

53.    On January 25, 2024, Purdue FCU agent Lakin Kaser responded to Plaintiff's January 2024 dispute, telling Equifax that the disputed information was accurate.

54.    On February 5, 2024, World Finance agent Rebekah Marks responded to Plaintiff's January 2024 dispute, telling Equifax that the disputed information was accurate.

55.    On or around February 11, 2024, Equifax notified Plaintiff of the results of his January 2024 dispute. In those results, Equifax informed Plaintiff that the account with Purdue FCU had been verified as belonging to Plaintiff. Equifax did not address Plaintiff's dispute of the World Finance account in its results.

56.    On or around August 28, 2024, Plaintiff obtained a copy of his Equifax credit report. The report showed Purdue FCU and Equifax were still reporting the fraudulent account as belonging to Plaintiff. Additionally, a collection agency named Security Credit Services had begun reporting on Plaintiff's credit and attempting to collect the fraudulent World Finance debt (which Plaintiff had previously disputed and which Equifax had previously deleted).

57.    On or around September 10, 2024, Plaintiff sent another letter to Equifax to dispute the inaccurate and derogatory accounts that Purdue FCU and Security Credit Services were reporting to Equifax. Plaintiff sent the dispute via USPS Certified Mail, Return Receipt Requested.

58.     On or around September 26, 2024, Equifax forwarded Plaintiff's September 2024 dispute to Purdue FCU.

59.     On or around September 27, 2024, Purdue FCU agent Brenda Biery responded to Plaintiff's dispute, telling Equifax that the disputed information was accurate.

60.     On or around November 16, 2024, Equifax notified Plaintiff of the results of his dispute. Equifax once again deleted the inaccurate and derogatory debt originating from World Finance, which had been sold to and reinserted on the Equifax report by Security Credit Services.

61.     For reasons better known to Equifax and unclear to Plaintiff, Equifax failed to provide conclusive dispute results for the account with Purdue FCU. Equifax's letter stated: "We have researched the credit account . . . the results are: - [.]"

62.     Plaintiff obtained a copy of his Equifax credit report on or around November 22, 2024. At that time, the Equifax report no longer contained the disputed accounts.

63.     Upon information and belief, the fraudulent accounts were removed from Plaintiff's Equifax file not due to any actions taken by the Defendants, but instead due to actions taken by Equifax.

### *The CRAs Forwarded Plaintiff's Disputes to Defendants, Who Did Nothing*

65.     In each instance in which Plaintiff disputed the Fraudulent Accounts with the CRAs, the CRAs forwarded Plaintiff's disputes to Defendants using an electronic system called "e-Oscar," which is an industry-wide process by which consumer disputes are electronically communicated to furnishers and dispute results are electronically communicated back to CRAs.

66.     On information and belief, e-Oscar is also the system by which both Defendants have agreed they will accept consumer disputes from the CRAs.

67.     In each instance in which Purdue FCU received one of Plaintiff's disputes from a CRA, Purdue FCU became obligated under the FCRA to investigate that dispute.

68.     In each instance in which World Finance received one of Plaintiff's disputes from a CRA, World Finance became obligated under the FCRA to investigate that dispute.

69.     Plaintiff's disputes to the Furnishers to attempt to have them investigate his complaints went unanswered.

70.     The Defendants failed to investigate Plaintiff's complaints.

71.     Despite Plaintiff providing Defendants with ample notice that he is a victim of identity theft and he does not owe the debts, Defendants continued to report the Fraudulent Accounts as "accurate" to the CRAs. Discovery will show that all Defendants did when supposedly investigating Plaintiff's disputes from the CRAs was consult their own respective internal account records and simply report back to the CRAs the same inaccurate information Plaintiff was disputing.

72.     On dates including January 24, 2024 and September 26, 2024, Equifax furnished Plaintiff's dispute to Purdue FCU.

73.     On dates including May 2, 2024 and September 20, 2024, Experian furnished Plaintiff's disputes to Purdue FCU.

74.     On dates including February 13, 2024 and September 17, 2024, Trans Union furnished Plaintiff's disputes to Purdue FCU.

75.     On dates including January 24, 2024, Equifax furnished Plaintiff's dispute to World Finance.

76.     Upon information and belief, the CRAs timely notified Defendants of Plaintiff's disputes, via e-OSCAR or otherwise, and provided the supporting documents with Plaintiff's disputes.

77.     By their actions as described herein, Defendants furnished and communicated false credit information regarding Plaintiff.

### Purdue FCU Obtained and Used Plaintiff's
### Consumer Report(s) Without a Permissible Purpose

78.     Accessing consumer reports is presumptively illegal. To overcome this presumption, a party seeking to access consumer reports must have a permissible purpose for doing so and must certify to the agency from which it seeks reports the FCRA purpose for which it will use the reports and that it will use the reports for no other purpose. 15 U.S.C. § 1681(f).

79.     One such permissible purpose that arises in the credit realm is for reports to issue "[t]o a person which [the reporting agency] has reason to believe—A intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer." 15 U.S.C. § 1681b(a)(3)(A).

80.     Likewise, Courts have long held that reports issued to a user involving an extension of credit or for collection purposes as to credit fall within the coverage of § 1681b(a)(3)(A). *Huertas v. Galaxy Asset Mgmt.*, 641 F.3d 28, 34 (3d Cir. 2011) ("the statute expressly permits distribution of a consumer report to an entity that 'intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer.'"); *Korotki v. Thomas, Ronald & Cooper, P.A.*, 131 F.3d 135 (4th Cir. 1997) (Defendant "was seeking to collect an account owed by the consumer, § 1681(b)(3)(A), likewise a permissible purpose"); *Cooper v. Pressler & Pressler, LLP*, 912 F. Supp. 2d 178, 188 (D.N.J. 2012) ("Capital One could rightfully obtain a copy of Plaintiff's consumer report from a CRA in order to review, or collect upon, Plaintiff's MasterCard credit card account.").

81.    Apart from 15 U.S.C. § 1681b(a)(3)(A), no other permissible purpose could conceivably allow Purdue FCU to access Plaintiff's consumer reports.

82.    Purdue FCU first accessed Plaintiff's credit file in connection with its issuance of the fraudulent deposit account. The information Purdue FCU received purportedly authorizing it to access Plaintiff's consumer report(s) bore multiple hallmarks of identity theft. Even a cursory evaluation of the information submitted to Purdue FCU to purportedly authorize it to access Plaintiff's credit report to issue a deposit account would have revealed that the application was fraudulent. Nonetheless, Purdue FCU illegally accessed Plaintiff's consumer report(s) and then issued a fraudulent account based on those consumer report(s).

83.    But for Purdue FCU's illegal access of Plaintiff's consumer reports, the fraudulent account would not have been opened.

84.    Purdue FCU continued to illegally access Plaintiff's consumer report(s) after Plaintiff notified Purdue FCU that the account was opened fraudulently.

85.    For example and without limitation, Purdue FCU illegally accessed Plaintiff's Trans Union report on August 1, 2024.

86.    Purdue FCU used information from one or more illegally obtained consumer report(s) regarding Plaintiff to unlawfully create an account in Plaintiff's name, without Plaintiff's permission. Then, Purdue FCU illegally accessed Plaintiff's report(s) again, even after Plaintiff informed it of the identity theft.

### *Plaintiff Suffered Actual Harm*

87.    Defendants continued to report the derogatory account on Plaintiff's credit reports even after being notified that this information is false.

88.     Plaintiff attempted to resolve this matter with Defendants, yet Defendants chose to ignore their duties under the FCRA. Defendants' failures to correct their reporting contributed significantly to the destruction of Plaintiff's credit through the repeated publication of false and defamatory information.

89.     As a result of the inaccurate and derogatory credit reporting (and Purdue FCU's illegal access to Plaintiff's report(s)), Plaintiff has suffered damages, including, but not limited to:

   a.  Harm to Plaintiff's credit opportunities;

   b.  Stress associated with not being able to correct the errors and have the fraudulent accounts removed from his credit file;

   c.  Monies lost by attempting to fix his credit, e.g., communication costs, postage for disputes;

   d.  Loss of time attempting to cure the errors;

   e.  Mental anguish, stress, aggravation, and other related impairments to the enjoyment of life;

   f.  Fear of embarrassment and reluctance to apply for credit; and

   g.  Loss of privacy and harm to his reputation.

90.     Specifically, Plaintiff's aggravation damages include (but are not limited to): severe depression and anxiety, loss of appetite, nausea, changes in weight, back and shoulder pain, heart palpitations, high blood pressure, irritability, muscle spasms, nightmares, sleep loss, feelings of fear, feelings of shame, embarrassment and humiliation, harm to relationships, difficulty concentrating, harm to job performance (resulting in job loss), harm to reputation, and loss of privacy.

***Defendants' Conduct was Willful***

91.     The FCRA allows for a remedy for a "willful" violation.  A willful act or violation includes, "not only knowing violations of [the statute], but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, at 57 (2007). A "reckless" action includes conduct whereby "the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69.

92.     Proof of willfulness includes, for example, "evidence that other consumers have lodged complaints similar to" the one made by Plaintiff and a failure to make the correction right away. *Dalton*, 257 F.3d at 418; *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 151 (4th Cir. 2008).

93.     Just in federal court alone, during the last decade, World Finance and its subsidiaries have had to defend over 100 consumer credit lawsuits.

94.     The CFPB has maintained a Consumer Complaint database since 2017.  It receives a small percentage of the total consumer credit reporting complaints made nationwide, as many multiples more are made directly to the Defendants, and/or to other government agencies, attorneys, or non-profit organizations.

95.     Since the CFPB began accepting complaints, World Finance has received almost 1,000 CFPB complaints from consumers for reporting inaccurate information on consumer credit reports. Over 300 of these complaints are about World Finance reporting information that belongs to someone else.  Almost 200 of those complaints involve World Finance not fixing a credit reporting error after receiving a consumer's dispute.

96.     For Purdue FCU, even within Plaintiff's own case, it has demonstrated an unwillingness to follow the law. Purdue FCU was informed of the identity theft multiple times, and yet it chose to do nothing.

97.     Defendants are also aware of substantive and detailed criticism by public interest groups about the automated dispute system that they have both agreed to use. For example, in 2009, the National Consumer Law Center ("NCLC"), the organization that publishes the leading legal treatise in this field, also published a scathing research paper detailing the actual process followed by the CRAs and furnishers (like Purdue FCU and World Finance) when a consumer makes a dispute. That report was updated in 2019. AUTOMATED INJUSTICE REDUX *Ten Years after a Key Report, Consumers Are Still Frustrated Trying to Fix Credit Reporting Errors*, National Consumer Law Center, February 2019. ("NCLC Report").[1]

98.     The NCLC Report summarized its context:

> Ten years ago, the National Consumer Law Center (NCLC) issued Automated Injustice: How a Mechanized Dispute System Frustrates Consumers Seeking to Fix Errors in their Credit Reports, the landmark report on the serious dysfunctions in the American credit reporting system. Since then, the Consumer Financial Protection Bureau (CFPB) began exercising supervision authority over the Big Three credit bureaus (Equifax, Experian and Trans Union), and started the difficult task of compelling them to reform their procedures and practices. A coalition of more than 30 state Attorneys General reached a breakthrough settlement with the credit bureaus in 2015, requiring an array of reforms. Despite these very laudable achievements, the credit bureaus and the companies that supply them with information still have serious problems in ensuring the accuracy of credit reports, affecting millions of American consumers. The dispute process required by the Fair Credit Reporting Act (FCRA) that was intended to fix these problems remains ineffective and biased.

NCLC Report at 2.

99.     Purdue FCU had notice of and its lawyers or other management employees responsible for FCRA compliance had reviewed *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142 (4th Cir. 2008).

100.    World Finance had notice of and its lawyers or other management employees responsible for FCRA compliance had reviewed *Saunders v. Branch Banking & Trust Co. of Va.*,

---

[1] *Available at* https://www.nclc.org/images/pdf/credit_reports/automated-injustice-redux.pdf.

526 F.3d 142 (4th Cir. 2008).

101.    Purdue FCU had notice of and its lawyers or other management employees responsible for FCRA compliance had reviewed *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295 (11th Cir. 2016).

102.    World Finance had notice of and its lawyers or other management employees responsible for FCRA compliance had reviewed *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295 (11th Cir. 2016).

103.    Purdue FCU had notice of and its lawyers or other management employees responsible for FCRA compliance had reviewed *Johnson v. MBNA,* 357 F.3d 426 (4th Cir. 2004).

104.    World Finance had notice of and its lawyers or other management employees responsible for FCRA compliance had reviewed *Johnson v. MBNA,* 357 F.3d 426 (4th Cir. 2004).

105.    Purdue FCU had notice of and its lawyers or other management employees responsible for FCRA compliance had reviewed *Daugherty v. Ocwen Loan Servicing, LLC*, 701 F. App'x 246 (4th Cir. 2017).

106.    World Finance had notice of and its lawyers or other management employees responsible for FCRA compliance had reviewed *Daugherty v. Ocwen Loan Servicing, LLC*, 701 F. App'x 246 (4th Cir. 2017).

107.    Purdue FCU had notice of and its lawyers or other management employees responsible for FCRA compliance had reviewed *Bach v. First Union Nat. Bank*, 149 F. App'x 354 (6th Cir. 2005).

108.    World Finance had notice of and its lawyers or other management employees responsible for FCRA compliance had reviewed *Bach v. First Union Nat. Bank*, 149 F. App'x 354 (6th Cir. 2005).

109.    Despite the notice and judicial, regulatory, and public interest criticism, Purdue FCU has refused to change its dispute investigation process because it believes it would cost too much money to do so.

110.    Despite the notice and judicial, regulatory, and public interest criticism, World Finance has refused to change its dispute investigation process because it believes it would cost too much money to do so.

111.    Defendants' procedures imposed on Plaintiff an unjustifiable and unreasonable risk of harm that could have been mitigated or avoided with just modest imposition.

## CLAIMS FOR RELIEF

### COUNT I
### VIOLATIONS OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681s-2(b)(A) & (B)
### *against Purdue FCU & World Finance*

112.    Plaintiff realleges and incorporates all factual allegations set forth in the Complaint.

113.    The duties on furnishers were enacted thirty years ago, in 1996. THE CONSUMER CREDIT REPORTING REFORM ACT OF 1996, Pub. L. No. 104-208 (1996).

114.    Furnishers' independent duties under the FCRA include independently investigating consumer disputes by reviewing all relevant information provided by the CRAs. Further, the furnisher must report the results of this investigation to the CRAs and accurately correct, update, or delete incorrect information previously reported to the CRAs.

115.    Purdue FCU violated 15 U.S.C. § 1681s-2(b)(1)(A) by failing to fully conduct a reasonable investigation of Plaintiff's disputes after his disputes were furnished directly to it by Equifax, Experian, and Trans Union.

116.    World Finance violated 15 U.S.C. § 1681s-2(b)(1)(A) by failing to fully conduct a reasonable investigation of Plaintiff's disputes after his disputes were furnished directly to it by Equifax.

18

117. "[T]he term 'investigation' is defined as '[a] detailed inquiry or systematic examination' or 'a searching inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016) (citations omitted). As the Fourth Circuit explained in *Johnson v. MBNA*:

> The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." Am. Heritage Dictionary 920 (4th ed.2000); see Webster's Third New Int'l Dictionary 1189 (1981) (defining "investigation" as "a searching inquiry").

357 F.3d 426, 430 (4th Cir. 2004).

118. Purdue FCU violated 15 U.S.C. § 1681s-2(b)(1)(B) by failing to review all relevant information provided when Equifax, Experian, and Trans Union forwarded Plaintiff's disputes to Purdue FCU.

119. World Finance violated 15 U.S.C. § 1681s-2(b)(1)(B) by failing to review all relevant information provided when Equifax forwarded Plaintiff's disputes to World Finance.

120. As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damage as alleged above, including by example only and without limitation: costs associated with disputing the inaccurate information, loss of credit opportunities, severe depression and anxiety, loss of appetite, nausea, changes in weight, back and shoulder pain, heart palpitations, high blood pressure, irritability, muscle spasms, nightmares, sleep loss, feelings of fear, feelings of shame, embarrassment and humiliation, harm to relationships, difficulty concentrating, harm to job performance (resulting in job loss), harm to reputation, and loss of privacy.

121. The violations by Defendants were willful, rendering each Defendant liable for punitive damages in amounts to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Defendants were negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

122.    Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees from each Defendant in amounts to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT II**
**VIOLATIONS OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681s-2(b)(C) & (D)**
*against Purdue FCU*

123.    Plaintiff realleges and incorporates all factual allegations set forth in the Complaint.

124.    Purdue FCU has long been aware that a furnisher must fully and accurately report to the CRAs the results of its investigation, including whether or not the consumer disputes such reporting. *Saunders v. Branch Banking and Tr. Co. Of VA*, 526 F.3d 142 (4th Cir. 2008) (Creditor's failure to report disputed nature of debt to all credit reporting agencies (CRAs), after receiving notice of dispute from one CRA, and conducting investigation and verification, was cognizable as violation of Fair Credit Reporting Act's (FCRA) duty to review and update reports for inaccuracies and omissions.)

125.    On one or more occasions within the past two years, by example only and without limitation, Purdue FCU violated 15 U.S.C. § 1681s-2(b)(1)(C) and (D) by publishing the false information within Plaintiff's credit files with the CRAs in response to his disputes without also including an accurate notation that the debt was disputed and by failing to correctly report results of an accurate investigation to the CRAs.

126.    On information and belief, Plaintiff alleges that Purdue FCU frequently fails to add the correct notation indicating that the account is disputed when it responds to the e-Oscar ACDVs.

127.    On information and belief, Plaintiff alleges that, after Purdue FCU responds to an e-Oscar ACDV from one consumer reporting agency, Purdue FCU rarely (if ever) reports the disputed nature of that debt to <u>all</u> consumer reporting agencies reporting that tradeline.

128.    Plaintiff's disputes were, at minimum, bona fide.

129.    As a result of these violations of 15 U.S.C. § 1681s-2(b)(C) and (D), Plaintiff suffered actual damages including but not limited to: costs associated with disputing the inaccurate information, loss of credit opportunities, severe depression and anxiety, loss of appetite, nausea, changes in weight, back and shoulder pain, heart palpitations, high blood pressure, irritability, muscle spasms, nightmares, sleep loss, feelings of fear, feelings of shame, embarrassment and humiliation, harm to relationships, difficulty concentrating, harm to job performance (resulting in job loss), harm to reputation, and loss of privacy.

130.    Purdue FCU was aware of the *Saunders v. Branch Banking & Trust* FCRA decision by the Fourth Circuit when it followed the ACDV procedures used regarding Plaintiff's disputes.

131.    On information and belief, Plaintiff alleges that the procedures followed regarding Plaintiff's FCRA disputes through e-Oscar were the procedures that Purdue FCU intended its employees or agents to follow.

132.    On information and belief, Plaintiff alleges that Purdue FCU's employees or agents did not make a mistake in the way they followed Purdue FCU's procedures when they received, processed and responded to the CRAs' ACDVs and did not include a proper notation regarding the account being in dispute.

133.    On information and belief, the Plaintiff alleges that Purdue FCU has not materially changed its FCRA investigation procedures regarding the notation of a dispute in ACDVs after learning of its failures in this case.

134.    The violations by Purdue FCU were willful, rendering Purdue FCU liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In

the alternative, Purdue FCU was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o.

Plaintiff does not seek joint liability.

135.    Plaintiff is entitled to recover actual damages, statutory damages, punitive

damages, costs, and attorney's fees from Purdue FCU in an amount to be determined by the Court

pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT III**
**VIOLATIONS OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681s-2(b)(E)**
*against Purdue FCU and World Finance*

136.    Plaintiff realleges and incorporates all factual allegations set forth in the

Complaint.

137.    Defendants each violated 15 U.S.C. § 1681s-2(b)(1)(E) by failing to accurately

correct and update or delete information from Plaintiff's file after receiving Plaintiff's disputes

from the CRAs and prior to the commencement of this action. These failures to correct Plaintiff's

information resulted from Defendants' failures to investigate as articulated in this Complaint, after

they each received notice of Plaintiff's disputes from the CRAs.

138.    As a result of this conduct (the action and inaction of Purdue FCU and World

Finance), Plaintiff suffered actual damages, including but not limited to: costs associated with

disputing the inaccurate information, loss of credit opportunities, severe depression and anxiety,

loss of appetite, nausea, changes in weight, back and shoulder pain, heart palpitations, high blood

pressure, irritability, muscle spasms, nightmares, sleep loss, feelings of fear, feelings of shame,

embarrassment and humiliation, harm to relationships, difficulty concentrating, harm to job

performance (resulting in job loss), harm to reputation, and loss of privacy.

139.    The violations by Defendants were willful, rendering each Defendant liable for

punitive damages in amounts to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the

alternative, Defendants were negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

140.    Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees from Defendants in amounts to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

### COUNT IV
### VIOLATIONS OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681b(f)
### *against Purdue FCU*

141.    Plaintiff realleges and incorporates all factual allegations set forth in the Complaint.

142.    Purdue FCU repeatedly violated 15 U.S.C. § 1681b(f) by unlawfully obtaining Plaintiff's consumer reports without Plaintiff's written authorization or a permissible purpose.

143.    Purdue FCU continued accessing Plaintiff's consumer reports even after Plaintiff gave Purdue FCU notice that Plaintiff is a victim of identity theft.

144.    Purdue FCU also violated 15 U.S.C. § 1681b(f) by failing to accurately and lawfully certify a permissible purpose when accessing Plaintiff's consumer report(s).

145.    Plaintiff's consumer report(s) contained a wealth of private information which Purdue FCU had no right to access absent a specific Congressional license to do so.

146.    Due to Purdue FCU's conduct, action, and inaction, Plaintiff suffered actual damages, including but not limited to invasion of his statutory right to confidentiality of his personal information, loss of privacy, loss of credit opportunities, harm to reputation, humiliation and embarrassment, and mental and emotion distress.

147.    The violations by Purdue FCU were willful, rendering Purdue FCU liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In

the alternative, Purdue FCU was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

148.    Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees from Purdue FCU in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury of all issues triable by jury.

## DEMAND FOR RELIEF

Plaintiff therefore respectfully requests that this Court:

(1)    Award Plaintiff actual and punitive damages for violations of the FCRA by Purdue FCU;

(2)    Award Plaintiff actual and punitive damages for violations of the FCRA by World Finance;

(3)    Award Plaintiff attorney's fees and costs under the FCRA;

(4)    Award Plaintiff pre-judgment and post-judgment interest at the legal rate; and

(5)    Award other relief as the Court deems appropriate.

**TRIAL BY JURY IS DEMANDED**.

**MARCUS SANDERS**

By: /s/ Douglas D. Martz
Douglas Martz Law, P.C.
Douglas D. Martz, Attorney at Law
Attorney No. 18783-27
1330 W. 1st Street
Marion, Indiana 46952
(765) 667-9910 - Telephone
E-Mail: dougmartzlaw@gmail.com

24

Leonard A. Bennett*
Mark C. Leffler*
Adam W. Short*
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
(757) 930-3660 - Telephone
(757) 930-3662 – Fax
Email: lenbennett@clalegal.com
Email: mark@clalegal.com
Email: adam@clalegal.com

*Pro hac vice applications forthcoming

Counsel for Plaintiff